# 24-2985-cv

## United States Court of Appeals

*for the*

## Second Circuit

COSMO MEZZINA,

*Plaintiff-Appellant,*

– v. –

PORT IMPERIAL FERRY CORP., d/b/a NY Waterway,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 22-CV-1987, JUDGE NAOMI REICE BUCHWALD

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

ANDREW V. BUCHSBAUM
FRIEDMAN, JAMES & BUCHSBAUM LLP
*Attorneys for Plaintiff-Appellant*
15 Maiden Lane, Suite 1202
New York, New York 10038
(212) 233-9385

C P COUNSEL PRESS     (800) 4-APPEAL • (369639)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    The District Court Erred in Granting Summary Judgment to
      New York Waterway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    The District Court Erroneously Found that the Open and
            Obvious Hatch Precluded Recovery by Mezzina . . . . . . . . . . . 14

      B.    Mezzina Plausibly Alleged Jones Act Negligence . . . . . . . . . . 16

            1.    The Captain's Failure to Re-Cover the Unoccupied
                  Hatch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.    The Barricades were Absent
                  and in Any Event Unsafe . . . . . . . . . . . . . . . . . . . . . . . 17

            3.    The Captain Issued an Improvident Order to Mezzina . . . 19

            4.    The Open Hatch Presented Mezzina with
                  a Severely Limited, Narrow and Dangerous
                  Path to the Stern Deck . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5.    Mezzina was Never Trained or Instructed to Use the Upper Deck to Retrieve a Line Located on the Main Deck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Mezzina has Plausibly Alleged a Seaworthiness Claim Against New York Waterway . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.    The Court Erroneously Found Mezzina 100% at Fault, Conflating Any Comparative Fault (Possible) with Assumption of Risk (Prohibited) . . . . . . . . . . . . . . . . . . . . . . . 23

E.    The Court Erred by Refusing to Consider Mezzina's Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

F.    The Court Erred by Failing To Issue Discovery Sanctions Due to New York Waterway's Spoliation of Photographs . . . . . 27

1.    New York Waterway Controlled the Photographs, They are Destroyed, and the Obligation to Preserve Them Arose when Mezzina was Injured . . . . . . . . . . . 28

2.    New York Waterway Had the Requisite 'Culpable State of Mind' to Justify Spoliation Sanctions . . . . . . . . 29

3.    The Photographs are Relevant to Mezzina's Claim . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## CASES

*Ammar v. United States,*
342 F.3d 133 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Barlas v. United States*,
279 F. Supp.2d 201 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Barlow v. Liberty Maritime Corp.*,
746 F.3d 518 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22, 23

*Beadle v. Spencer*,
298 U.S. 124 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Belle v. Waterman S.S. Corp.*,
No. 95 Civ 3765(JFK), 1998 WL 9386 (S.D.N.Y. Jan. 13, 1998) . . . . . . . . . 20, 23

*Bracone v. Bridgeport & Port Jefferson Steamboat Co.,*
No. 05-cv-1312, 2009 WL 724041 (D. Conn. March 18, 2009) . . . . . . . . . . . .  15

*In re Buchanan Marine*,
874 F.3d 356, 369-370 (2d Cir. 2017),
*cert. denied*, 584 U.S. 916 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Byrnie v. Town of Cromwell Bd. of Educ.,*
243 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Combs v. United States*, 73 F. Supp. 665 (S.D.N.Y. 1947) . . . . . . . . . . . . . . . 20, 23

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.,*
62 F.4th 748 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*CSX Transp. v. McBride*,
564 U.S. 685 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Darlington v. National Bulk Carriers Inc.,*
157 F.2d 817 (2d Cir.1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

*Earl v. Bouchard Transp. Co.,*
917 F.2d 1320 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fitzgerald v. U.S. Lines Co.*,
374 U.S. 16 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fonsell v. New York Dock Ry.,*
198 F. Supp. 332 (E.D.N.Y.1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*George v. Marquette Transp. Co.*,
No. 16-1286, 2017 WL 2798464 (E.D. La. June 28, 2017) . . . . . . . . . . . . . . . . 21

*Grief v. Nassau Cnty.*,
No. 15-7240, 2022 WL 307154 (E.D.N.Y. Feb. 2, 2022) . . . . . . . . . . . . . . . . . . 30

*Hanson v. Luckenbach S.S. Co.*,
65 F.2d 457 (2d Cir. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Harrington v. Atl. Sounding Co., Inc.,*
602 F.3d 113 (2d Cir. 2010), *cert. denied*, 562 U.S. 1207 (2011) . . . . . . . . . . . . . 13

*Jackson v. NCL America, LLC*,
No. 14-23460, 2016 WL 9488717 (S.D. Ala. Jan. 26, 2016) . . . . . . . . . . . . . 15, 16

*Johnson v. Horizon Lines, LLC*
520 F. Supp.2d 524 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Knight v. Grand Victoria Casino*,
No. No. 98-8439, 2000 WL 1898843 (N. Dist. Ill. Dec. 28, 2000) . . . . . . . . . . . 25

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Luwisch v. American Marine Corp.*,
No. 17-3241, 2018 WL 3031887 (E.D. La. June 18, 2018),
*aff'd after trial*, 956 F.3d 320 (5th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marasa v. Atl. Sounding, Inc.*,
No. 13–272–cv, 557 F. App'x. (2d Cir. Jan. 21, 2014) . . . . . . . . . . . . . . . 14, 21, 23

*Matteo v. Kohl's Dep't Stores, Inc.*,
No. 09-cv-7830, 2012 WL 760317
(S.D.N.Y. Mar. 6, 2012), *aff'd*, 533 F. App'x 1 (2d Cir. 2013) . . . . . . . . . . . . . . 28

*Mezzina v. Port Imperial Ferry Corp.*,
No. 22-civ. 1987 (NRB),
2024 WL 689960 (S.D.N.Y. Feb. 20, 2024) . . . . . . . . . . . . . . . . . .    3, 17, 26, 27

*Mitchell v. Trawler Racer, Inc.*,
362 U.S. 539 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Moll v. Telesector Res. Grp., Inc.*,
760 F.3d 198 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Morales v. Quintel Ent., Inc.*,
249 F.3d 115 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Moran Towing Corp.*,
984 F.Supp.2d 150, 178-79 (S.D.N.Y. 2013),
*vacated in part on other grounds*, 597 F. App'x 33 (2d Cir. 2015) . . . . . . . . . 21, 22

*Oxley v. City of New York*,
923 F.2d 22 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 22

*Pechawer v. Art Catering, Inc.*,
No. 05-6870, 2007 WL 2127824 (E.D. La. July 25, 2007) . . . . . . . . . . . . . . . . . 16

*Perkins v. Wood Towing Co.*,
No. 97-3664, 1999 WL 777734 (E.D. La. Sept. 29, 1999) . . . . . . . . . . . . . . . . . 16

*Quraishi v. Port Auth. of New York & New Jersey*,
No. 13-cv-2706 (NRB), 2015 WL 3815011 (S.D.N.Y. June 18, 2015) . . . . . . . . . 28

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Reskin v. Minnesota Atl. Transit Co.*,
107 F.2d 743 (2d Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Rivera v. Farrell Lines, Inc.*,
474 F.2d 255 (2d Cir.), *cert. denied*, 414 U.S. 822 (1973) . . . . . . . . . . . . . . . 23, 25

*Rossbach v. Montefiore Med. Ctr.*,
81 F.4th 124 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29

*Rush v. Cargo Ships & Tankers, Inc.*,
360 F.2d 766 (2d Cir. 1966), *cert. denied*, 385 U.S. 842 (1966) . . . . . . . . . . . . . 19

*Scoran v. Overseas Shipholding Group, Inc.*,
703 F. Supp.2d 437 (S.D.N.Y 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23, 25

*Sierra v. Nat'l R.R. Passenger Corp.*,
No. 22-1574, 2023 WL 7986169 (2d Cir. Nov. 17, 2023) . . . . . . . . . . . . . . . . . . 13

*Slovin v. Target Corp.*,
No. 12-cv-863, 2013 WL 840865 (S.D.N.Y. March 7, 2013) . . . . . . . . . . . . . . . . 28

*Soliman v. Maersk Line, Ltd.*,
235 F. Supp.3d 410 (E.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . 14, 20, 21, 23

*Tiller v. Atlantic Coast Line R. Co.*,
318 U.S. 54 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Tufariello v. Long Island R.R. Co.*,
458 F.3d 80 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ulfik v. Metro-North Commuter R.R.*,
77 F.3d 54 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Williams v. Long Island R.R. Co.*,
196 F.3d 402 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wills v. Amerada Hess Corp.*,
379 F.3d 32 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005) . . . . . . . . . . . . . . 13

### STATUTES

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

45 U.S.C. § 51 (Federal Employers' Liability Act) . . . . . . . . . . . . . . . . . . . . . 13, 14

46 U.S.C. § 30104 (Jones Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### RULES

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

vi

## REGULATIONS

46 C.F.R. § 42.15-75(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3

46 C.F.R. § 116.900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

## WEBSITES

www.melbaswintex.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

## PRELIMINARY STATEMENT

While obeying Captain's orders, Plaintiff-seaman Cosmo Mezzina fell into an uncovered and unoccupied hatch on Defendant's vessel and was injured. Defendant New York Waterway contended the hatch was safely barricaded; Mezzina argued it was not, and that the empty hatch should have been re-covered. The court granted summary judgment to New York Waterway, dismissed Mezzina's Jones Act and seaworthiness claims, and blamed Mezzina 100%: "[T]he undisputed facts suggest that plaintiff failed to take even the slightest precaution in avoiding an open and obvious danger of which he was well aware." JSA.27. This was error, because the court failed to credit New York Waterway's negligence and the unseaworthy conditions advanced by Mezzina. Moreover, the court misapplied the law, conflating Mezzina's possible comparative fault with assumption of risk. Mezzina appeals. The court's order should be reversed.

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York dismissed Mezzina's Jones Act and warranty of seaworthiness causes of action by Memorandum and Order entered February 20, 2024. Mezzina's sole remaining maintenance and cure cause of action was dismissed by stipulation on October 24, 2024. Mezzina filed his Notice of Appeal on November 13, 2024. This appeal is

from final orders that dispose of all parties' claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Did the district court commit reversible error by dismissing Mezzina's Jones Act and seaworthiness causes of action pursuant to Fed. R. Civ. P. 56?

2.     Did the district court commit reversible error by failing to consider Mezzina's declaration submitted in opposition to New York Waterway's cross-motion for summary judgment?

3.     Did the district court commit reversible error by failing to enter discovery sanctions due to NY Waterway's spoliation of photographs?

## STATEMENT OF THE CASE

### I.    Procedural Background

Plaintiff-Appellant Cosmo Mezzina filed suit against Defendant-Appellee NY Waterway alleging causes of action pursuant to the Jones Act, 46 U.S.C. § 30104, the warranty of seaworthiness, and maintenance and cure, seeking recovery for injuries he suffered on October 1, 2021 while employed by New York Waterway as a seaman aboard its vessel "Garden State." *See* A.8-12.

Mezzina moved for summary judgment as to liability on the ground that New York Waterway violated the Protection of the Crew regulation, 46 CFR § 42.15-75(d), which constituted negligence *per se* under the Jones Act, rendered the vessel

2

unseaworthy as a matter of law, and barred proof of comparative fault.[1]  Mezzina also sought discovery sanctions due to NY Waterway's failure to produce the complete accident report, photographs and video.  *See* A.23-220.

NY Waterway opposed and cross-moved for summary judgment seeking dismissal of Mezzina's Jones Act and seaworthiness claims.  *See* A.221-331

The district court (Naomi Reice Buchwald, J.) denied Mezzina's motion and granted NY Waterway's motion.  *Mezzina v. Port Imperial Ferry Corp.*, SPA 1-40, No. 22-cv-1987-NRB, 2024 WL 689960 (S.D.N.Y. Feb. 20, 2024).  This appeal followed.

## II.    Factual Background

On October 1, 2021, Mezzina (dob: 6/1947) was employed by NY Waterway as deckhand on its Coast Guard inspected vessel "Garden State."  A.32,Tr.7-8; A.33,Tr.12; A.40,Tr.40; A.9,¶4; A.10,¶¶10,14; A.14, ¶¶4,10,14; A.111.  Mezzina was subordinate to and reported to the vessel's Captain, Mohamed Abdelrahman, who as "top man," was in overall command and empowered to direct and issue orders to Mezzina.  A.85,Tr.6-7.  Captain Abdelrahman was also responsible for accident investigation.  *Id*.  Mezzina, deckhand McCullough, and Captain Abdelrahman comprised the vessel's crew.  A.42,Tr.47-48.

---

[1]Mezzina hereby abandons on appeal his contentions that New York Waterway violated the Protection of the Crew regulation, 46 CFR § 42.15-75(d), thereby constituting negligence *per se* and precluding proof of Mezzina's comparative fault.

As the "Garden State" backed away from Pier 11 laden with passengers, it allided with the pier there, contact described by the Captain as "medium," but nonetheless investigated by the Coast Guard. A.87,Tr.15; A.340. Deckhand McCullough injured his back and could not continue his duties; Mezzina was uninjured. A.89,Tr.12; A.90,Tr. 21; A.52,Tr.86. After confirming passengers were uninjured, the Captain sailed the vessel back to the Hoboken terminal, disembarked all passengers, and then brought the vessel to NY Waterway's work barge to inspect for damage. A.45,Tr.61-62; A.88, Tr.20-22.

A screen shot from exterior work barge surveillance camera videos submitted to the Court shows the "Garden State," bow in, minutes before the incident:



*Figure 1*

4

Mezzina and the Captain tied the vessel to the work barge with two bow lines and a port stern line, leaving the starboard stern untethered. A.46, Tr.63; A.53, Tr.90; A.90, Tr.25-26; *see also Travel Lift Barge 2* video at 2:36 *et seq.*; *Travel Lift Barge 4* video at 1:30 *et seq.* To inspect below-deck damage, the Captain had to access a lazarette hatch, the cover of which was located on the main deck starboard passenger aisle towards the stern.



*Figure 2*

A.127. Mezzina and the Captain both removed the hatch cover by hand. A.46,Tr.65-69; A.49,Tr.75-76; A.50 Tr.78-79; A.92,Tr.33-34; A.94,Tr.42.

The hatch opening is approximately 39 inches by 32 inches. A.134. The drop from the hatch opening to the keel below is approximately 7 feet. *Id.*



*Figure 3*

A.134.  Less than a foot of flooring remained between the open hatch and rows of

passenger seating (at left in figure 2 above), and at most a few inches between the

hatch and the engine room door (at right in figure 2 above).  A.127, 134, 282; *See*

*also* JSA. 4, n.3.

The Captain ordered Mezzina to help set up a movable barricade around the

open hatch.    A.50,Tr.81;A.51,Tr.82-85;  A.94,Tr.41-44.    A roadway "traffic

management" barricade manufactured by Melba Swintex was used.  A.134; A.153.

*See also* www.melbaswintex.com (A.134).

Mezzina testified he set up the barricade in two sections, covering the

starboard and forward sides of the open hatch.  A.51,Tr.82-24.  Mezzina then left the

area to talk to McCullough (recovering from his injuries and unable to work) and

awaited further orders from the Captain. A.50,Tr.80; A.52,Tr.88. Mezzina never went into the hatch. A.52,Tr.86.

A photograph taken during the parties' joint inspection re-creating the barricade set-up as Mezzina testified (looking aft towards the vessel's stern) follows:



*Figure 4*

A.135; A.277.[2]

Captain Abdelrahman testified that the barricade was set up in three sections, surrounding the hatch on three sides, based on photographs he took at the request of counsel on October 18, 2022, over a year after the incident:

---

[2] There is no proof that the orange cone in Figure 4 was present on the date of incident.



*Figure 5*

A.94,Tr.44-A.95,Tr.46.   While in the hatch, Captain Abdelrahman spoke on his phone with New York Waterway's Port Captain and, according to Mezzina, photographed the below-deck damage.   A.52,Tr.88-89; A.96,Tr.50.

The Captain eventually left the hatch, disembarked, walked onto the work barge off the starboard stern, and inspected and photographed exterior damage. A.90,Tr.28-29; *Travel Lift Barge 4* video at 5:51 *et seq*.   The Captain testified he "closed the hatch safely."   A.96,Tr.50; Mezzina testified the Captain left the hatch open.   A.56,Tr.103.   *See also* A.333 ¶¶ 10, 12.[3]

---

[3]A.333 is part of Mezzina's declaration submitted in opposition to New York Waterway's cross-motion for summary judgment.   *See* A.332-336.   The court erroneously refused to consider this declaration.   See discussion *infra* at I(E).

The vessel began rocking back and forth banging on the work barge due to incoming sea, waves and wakes. A.52,Tr.89-A.53,Tr.90-93; *see also Travel Lift Barge 2* video at 13:00-14:50*; Travel Lift Barge 4* video at 12:51-14:41. The Captain came outside, saw no starboard stern line, and ordered Mezzina to help tie the vessel's unsecured starboard stern to the work barge. *Id.* "Cosmo, get the line, let's tie it up on the other side of the boat." A.52,Tr.89; *see also* A.96,Tr.50-52.

Mezzina's declaration (again, erroneously rejected by the court) stated that: the Captain motioned towards the stern door; Mezzina had seen the Captain standing in the 1 foot area between the hatch and passenger seats which Mezzina intended to access; and Mezzina had never used (or been trained to use) the upper deck to retrieve a line located on the main deck. *See* A.333-336.

Mezzina ran "not really fast" or "little bit running" down the starboard passenger aisle towards the stern door intending to exit through the door, retrieve a line stored on the stern deck and throw it to the Captain, standing on the work barge. A.53,Tr.92-A.54,Tr.94; A96,Tr.50-52. Mezzina fell into the open hatch due to the rocking of the vessel, the missing barricade and the open hatch. A.53,Tr.93-A.54,Tr.94 ("the guardrail was not there no more"). The barricade did not fall into the open hatch with Mezzina. *Id; see also* A.333-336.

The Captain heard screaming from inside the vessel, ran back inside and saw Mezzina injured at the bottom of the open hatch. A.97,Tr.53-54; *Travel Lift Barge 2*

9

video at 13:00-14:50. Mezzina was pulled from the hatch. A.55,Tr.98-99; A.97,Tr.56-A.98,Tr.58. Mezzina was unable to walk without assistance and hopped on one foot to the bow, placed on an equipment cart and wheeled off the work barge for medical treatment. *Travel Lift Barge 2* video at 29:14-33:36.

The Captain testified that after Mezzina fell into the hatch, he saw the barricade positioned as shown below, a photograph the Captain took over a year after the incident upon instructions from New York Waterways' attorneys. JA-97:54:25-56:9.



*Figure 6*

**SUMMARY OF ARGUMENT**

**I.** The court erroneously found that the open and obvious hatch precluded recovery by Mezzina. The open and obvious but dangerous condition did not absolve NY

10

Waterway of its general duty of care, and issues of fact existed as to the parties' relative fault, thereby precluding summary judgment.

**II.** The court erred by failing to credit Mezzina's allegations of Jones Act negligence based on (a) the Captain's failure to re-cover the open and unoccupied hatch; (b) the absence of the barricades, which, even if present, were unsafe; (c) the improvident order issued by the Captain to Mezzina, requiring Mezzina to exit the main deck stern door to retrieve a line to secure the starboard stern quarter to prevent the already damaged vessel from banging against the dock; (d) the severely limited and narrow path to the stern deck presented to Mezzina; (e) the lack of training, instruction or order to use the upper deck to retrieve a line located on the main deck.

**III.** Mezzina plausibly alleged unseaworthy conditions based on the same allegations under the Jones Act. Proof of Jones Act negligence and breach of the warranty of seaworthiness are intertwined regardless of the burden of proof. The court failed to credit these allegations and issues of fact exist.

**IV.** The court erroneously found Mezzina 100% at fault, conflating comparative fault (possibly allowable) with assumption of risk (prohibited). There was no proof that Mezzina "failed to take even the slightest precaution in avoiding an open and obvious danger of which he was well aware." Mezzina was following the Captain's order.

V. The court erred by refusing to consider Mezzina's declaration. The "sham issue of fact doctrine" relied on by the court had no application because the declaration did not "inescapably and unequivocally" contradict Mezzina's earlier testimony, which was incomplete.

VI. The court's refusal to issue spoliation sanctions due to destruction of photographs was erroneous. The photographs admittedly existed, and were destroyed and relevant.

## STANDARD OF REVIEW

The grant of a summary judgment motion is reviewed *de novo*. The court must "constru[e] the evidence in the light most favorable to the party against whom summary judgment was granted and draw[ ] all reasonable inferences in that party's favor." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (*per curiam*) (citations and quotation marks omitted). Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. "The same standard applies where, as here, the parties filed cross-motions for summary judgment and the district court granted one motion, but denied the other." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

In Jones Act cases, "[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed.'" *Oxley v. City of New York*, 923 F.2d

22, 25 (2d Cir. 1991) (quotation and citation omitted). This relaxed interpretation of the Jones Act is long established. *See generally Harrington v. Atl. Sounding Co., Inc.,* 602 F.3d 113, 131-33 (2d Cir. 2010) (Calabresi, J., dissenting), *cert. denied,* 562 U.S. 1207 (2011), discussing the historical evolution of the Jones Act.

Thus, a plaintiff "shoulders a lighter burden for establishing negligence than her counterpart on land would carry." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 45 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005) (cleaned up). The Supreme Court re-affirmed the liberal construction afforded the Jones Act, holding that under the Federal Employers' Liability Act, 45 U.S.C. § 51 (FELA) (applicable to the Jones Act), liability is established if "[d]efendant's negligence played a part—no matter how small—in bringing about the injury." *CSX Transp. v. McBride*, 564 U.S. 685 (2011); *see also Harrington v. Atl. Sounding Co., Inc.,* 602 F.3d 113, 119 (2d Cir. 2010), *cert. denied*, 562 U.S. 1207 (2011) (recognizing Jones Act adopts FELA doctrine of liability); *Sierra v. Nat'l R.R. Passenger Corp.*, No. 22-1574, 2023 WL 7986169, at *2 (2d Cir. Nov. 17, 2023) ("For more than a century, federal law has applied a relaxed standard of negligence to claims brought by employees against railroads engaged in interstate commerce. In light of this relaxed standard of negligence in FELA cases, this Court has long held that the right of the jury to pass on factual issues must be liberally construed (*citing Williams v. Long Island R.R. Co.*, 196 F.3d 402, 407 (2d Cir. 1999)). Thus, an employer may be held liable under

13

FELA and the Jones Act "for risks that would otherwise be too remote to support liability at common law." *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996) (cited with approval in *Sierra*, *supra*).[4]

## ARGUMENT

### I.    The District Court Erred in Granting Summary Judgment to New York Waterway.

#### A.    The District Court Erroneously Found that the Open and Obvious Hatch Precluded Recovery by Mezzina.

The court concluded that an open and obvious but dangerous condition completely barred a seaman's injury claim, without crediting allegations of New York Waterway's fault. This was error because the court failed to construe the evidence in the light most favorable to Mezzina, especially given the reduced burden

---

[4] In *Marasa v. Atl. Sounding, Inc.*, 557 F. App'x 14 (2d Cir. 2014), this Court did not decide whether *McBride* "dictates that an ordinary, rather than a relaxed, negligence standard must be applied[]" under the Jones Act, reasoning that the district court expressly stated that it found [decedent] had satisfied "the ordinary negligence standard" (citations omitted). Nonetheless, in *Marasa*, this Court cited with approval *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 90 (2d Cir. 2006), an FELA case, for the proposition that the negligence standard of care under the Jones Act "is high." *See also Soliman v. Maersk Line, Ltd.*, 235 F. Supp.3d 410, 418 (E.D.N.Y. 2017) (adopting FELA negligence standard in Jones Act case). Mezzina submits he has satisfied the ordinary negligence standard here, and has plausibly alleged unseaworthy conditions. In any event, given this Court's adoption of a reduced negligence standard in the several FELA cases cited herein, it is respectfully submitted that there is no logical, practical or legal reason to treat the negligence standard in a seaman's Jones Act case differently from a railway worker's FELA claim. The specific text of the Jones Act buttresses this conclusion: "Laws of the United States regulating recovery for personal injury to, or death of, a railway employee [*i.e.* FELA] apply to an action under this section." 46 U.S.C. § 30104.

of proof in the summary judgment and Jones Act context. Moreover, the court's

reasoning is unsupported by caselaw.

In *In re Buchanan Marine*, 874 F.3d 356, 369-370 (2d Cir. 2017), *cert.*

*denied*, 584 U.S. 916 (2018), this Court correctly stated the analysis:

> The district court determined that these claims failed because the
> alleged hazard—the presence of excess stone on the margin deck of the
> Barge—was open and obvious. The district court's holding in this
> regard was based on an error of law. New York law utilizes a
> comparative negligence scheme, meaning the doctrines of contributory
> negligence and assumption of risk are not complete defenses as a matter
> of law. ("[U]nder New York law the open and obvious nature of a
> dangerous condition ... does not absolve the landowner of its general
> duty of care."). Even assuming the condition was open and obvious, a
> factual question exists as to the relative fault of the parties.

*See also Bracone v. Bridgeport & Port Jefferson Steamboat Co.*, No. 05-cv-1312,

2009 WL 724041 (D. Conn. March 18, 2009) (in a passenger's injury action, vessel

owner's defense that height differential between edge of ramp and dock was open

and obvious evaluated based on comparative fault of the parties).

Although *Buchanan Marine* was predicated on New York state law (after

plaintiff failed to attain seaman status), the same analysis is applied in Jones Act

cases. *See*, *e.g.*, *Luwisch v. American Marine Corp.*, No. 17-3241, 2018 WL

3031887, at *4, n.56 (E.D. La. June 18, 2018), *aff'd after trial*, 956 F.3d 320 (5th Cir.

2020) ("The Court notes that Defendant's argument that the condition of the rope

was "open and obvious" is unavailing, as Plaintiff's negligence claim is not based

on a failure-to-warn theory (citation omitted)); *Jackson v. NCL America, LLC*, No.

15

14-23460, 2016 WL 9488717, at *3 (S.D. Ala. Jan. 26, 2016) ("If a danger is open and obvious, this may support a finding of comparative negligence."); *Pechawer v. Art Catering, Inc.*, No. 05-6870, 2007 WL 2127824, at *4 (E.D. La. July 25, 2007) ("Pechawer does not allege that Art failed to warn him of the alleged safety problems. In other words, he does not claim that Art breached this part of its duty to provide a safe work environment. As a result, whether or not the alleged safety problems were 'open and obvious' does not eliminate at this juncture ART's potential liability for allegedly failing to provide Pechawer with a safe working environment."); *Perkins v. Wood Towing Co.*, No. 97-3664, 1999 WL 777734, at *2 (E.D. La. Sept. 29, 1999) ("Furthermore, plaintiff is correct in his assertion that the defense of an open and obvious condition does not in itself defeat the possibility of recovery. In general, the doctrine of contributory negligence operates to reduce plaintiff's recovery, it does not preclude recovery." (citations omitted)).

**B.     Mezzina Plausibly Alleged Jones Act Negligence.**

**1.     The Captain's Failure to Re-Cover the Unoccupied Hatch.**

Mezzina's expert, Captain Joseph Ahlstrom, opined:

> Upon leaving the hatch, Captain Abdelrahman should have either (a) replaced the hatch cover or (b) ensured that appropriate barricades were in place, especially given the rough sea conditions which caused the vessel to rock.

A.127, 141. The district court erroneously discredited this practical, common sense preventative measure:   "Likewise, plaintiff cites no case law or other support

suggesting that the captain acted negligently in failing to replace the hatch cover when he exited the hatch." SPA.27, *Mezzina*, 2024 WL 689960, at *10.

Even without an expert opinion or case law, a jury could reasonably conclude that failing to re-cover the unoccupied hatch was unsafe, based on common sense alone. Judge Haight agreed in *Johnson v. Horizon Lines*, *LLC*, 520 F. Supp.2d 524, 526 (S.D.N.Y. 2007):

> The main deck space between the 7 and 8 hatches, where Johnson had to place his ladder to ascend to the second tier of containers, was unsafe because the smaller hatch leading to the tunnel below was uncovered. This is a common sense conclusion, requiring no particular expertise. The vessel's witnesses have testified that the practice was to leave this hatch covered and dogged down while she was in port. The reason why is obvious: it is dangerous to have an open hatch on a deck where work is going on.

At the very least, an issue of fact exists as to whether the hatch should have been re-covered once the Captain left the hatch.

## 2. The Barricades were Absent and in Any Event Unsafe.

Mezzina testified the barricades were absent when he fell into the hatch. A.53,Tr.93-A.54,Tr.94. Regardless, Mezzina's expert opined they were unsafe, while New York Waterway's expert deemed them safe. Given this issue of fact, summary judgment was granted improvidently by the court. *See Scoran v. Overseas Shipholding Group*, *Inc.*, 703 F. Supp.2d 437, 455-56 (S.D.N.Y 2010) (contested feasibility and custom of railings around a vessel swash hole created issue of fact).

Specifically, Mezzina's expert opined that the barricades here, manufactured by Melba Swintex—the "*leading manufacturer of Temporary Traffic Management Products,*" were not reasonably fit to protect Mezzina from falling into the open hatch on a floating, moving vessel subject to waves, wakes, wind and current. A.134, 140-41. The flimsy, hollow, plastic Melba Swintex barricades were movable and wholly unsecured to anything on the vessel. They had no secure base. See Figure 6 above. The Melba Swintex website referenced by Mezzina's expert refers to its products as suitable for use in roadway "traffic management," "street furniture," "event management" and "ground protection," a far cry from a roiling sea.

New York Waterway's expert Kline admitted as much: the barricades "are to be used as a visual warning only and are not intended as a physical barrier." A.274, 283, 286, 328. Kline equates the barricades to the "safety rail on the exterior of the vessel." A.286 ¶ 4. Those safety rails, however, include "wire rope, chains, and bulwarks" and must withstand "point load of 91 kilograms (200 pounds) applied at any point in any direction, and a uniform load of 74 kilograms per meter (50 pounds per foot) applied to the top rail in any direction." *See* 46 C.F.R. § 116.900 ("Deck rails"). The Melba Swintex road traffic barricades fail on all accounts and a reasonable jury could conclude that, even if present, the barricades were unsafe under existing conditions, creating material issues of fact.

18

### 3. The Captain Issued an Improvident Order to Mezzina.

The Captain ordered Mezzina to retrieve a line located on the stern deck to throw to the Captain, on the pier, so the Captain could tie the vessel's unsecured starboard aft quarter to the pier to prevent further damage. The Captain indicated Mezzina should exit through the aft door, the customary route to the stern deck, requiring Mezzina to squeeze between the open and unoccupied hatch and adjacent passenger seating, less than a foot wide. Mezzina had seen the Captain in that restricted area. A.332-36 (Mezzina declaration). There is no proof that the Captain ever ordered Mezzina to use the top deck.

The Captain's order placed Mezzina in harm's way, was improvidently issued, and constitutes negligence and unseaworthiness. *See, e.g., Rush v. Cargo Ships & Tankers, Inc.*, 360 F.2d 766, 768 (2d Cir. 1966), *cert. denied*, 385 U.S. 842 (1966) (seaman injured when ordered to jump to dock- "The jury could have found a negligent order, and the injury a proximate result of it, rather than of any scum or garbage on the ledge."); *Darlington v. National Bulk Carriers Inc.*, 157 F.2d 817 (2d Cir.1946) ("The plaintiff was bound to obey the orders of his superiors on board the vessel. The chief officer was the plaintiff's superior and plaintiff was bound to obey the orders of the chief officer."); *Reskin v. Minnesota Atl. Transit Co.*, 107 F.2d 743, 745 (2d Cir. 1939) ("There was adequate proof that there were other and safe ways to take the shovels up to the deck above and the jury was well within the evidence

19

in finding that the mate was negligent in ordering the plaintiff to make the dangerous climb which caused his injuries."); *Hanson v. Luckenbach S.S. Co.*, 65 F.2d 457, 458 (2d Cir. 1933) ("The boatswain's order seems to us to have been inherently dangerous; nobody ought to be asked to do such a job in such a place, . . . ."); *Belle v. Waterman S.S. Corp.*, No. 95 Civ 3765 (JFK), 1998 WL 9386, at *6 (S.D.N.Y. Jan. 13, 1998) ("The Court therefore finds that Plaintiff presented sufficient evidence from which reasonable men might find that the steward gave an improvident order, deviating from the safe and proper method of performing the task of transporting the stores, and the steward's negligence resulted in foreseeable harm to Plaintiff."); *Combs v. United States*, 73 F. Supp. 665, 666 (S.D.N.Y. 1947) ("The rail was never intended as a place to stand, and it was negligence for the boatswain to order the libelant to use such a support in rigging the awning.").

### 4. The Open Hatch Presented Mezzina with a Severely Limited, Narrow, and Dangerous Path to the Stern Deck.

Regardless whether the barricade was present, or its position, Mezzina was faced with a severely restricted path to the stern deck, with the open hatch to his right and passenger seating to his left. *See, e.g.*, photos, at A.277, 282; fig. 3, *supra*. Such a limited area constitutes negligence under the Jones Act and an unseaworthy condition. *See*, *e.g.*, *Hanson, supra,* 65 F.2d 457 (2d Cir. 1933) ("But a space of only one foot, or even two, is too narrow, if indeed possible at all, for that purpose."); *Soliman*, *supra*, 235 F.Supp.3d at 419 ("Once docked, crewmembers must pull bags

20

in a space which does not allow for much turning or movement without fear of falling."); *George v. Marquette Transp. Co.*, No. 16-1286, 2017 WL 2798464 (E.D. La. June 28, 2017) (cluttered rigging equipment on deck in the area plaintiff was required to walk constituted negligence and unseaworthiness sufficient to defeat defendant's motion premised on the open and obvious condition of the deck.).

### 5.  Mezzina was Never Trained or Instructed to Use the Upper Deck to Retrieve a Line Located on the Main Deck.

In the approximate 19 years that Mezzina worked for NY Waterway, he never went to the upper deck to get a line because lines are always located on the main deck.  The Captain never told him to use the upper deck to retrieve a line located on the main deck.  Mezzina Declaration, A.335, ¶¶ 22-23.  Failure to properly train a seaman constitutes negligence and unseaworthiness.  *See, e.g., Marasa, supra* (affirming a finding of unseaworthiness when "crew was not trained for the specific task . . . at issue."); *Soliman,* 235 F. Supp.3d at 419 ("Maersk has breached its duty of care under both the Jones Act and general maritime law by failing to conduct a risk assessment of its garbage disposal procedures and failing [to] train its crew in safe pulling techniques."); *In re Moran Towing Corp.*, 984 F.Supp.2d 150, 178-79 (S.D.N.Y. 2013), *vacated in part on other grounds*, 597 F. App'x 33 (2d Cir. 2015) ("Moran's inadequate training and safety procedures not only contributed to the unseaworthiness of the Tug and its crew, but also constituted negligence under the

Jones Act.).  At most, Mezzina's failure to access the stern deck via the upper deck may be for a jury's determination of his comparative fault.  *See* § D, *infra*.

### C. Mezzina has Plausibly Alleged a Seaworthiness Claim Against New York Waterway.

Based on similar factual allegations and issues discussed in § B above, the court erroneously dismissed Mezzina's seaworthiness claim.  Despite their conceptual separateness, both Jones Act and unseaworthiness theories of recovery often "depend in large part upon the same evidence, and involve some identical elements of recovery." *Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 18 (1963).

The warranty of seaworthiness is well-defined under general maritime law: "an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service." *Oxley v. City of New York*, 923 F.2d 22, 24-25 (2d Cir. 1991).  Moreover, a shipowner's liability for failure to furnish a seaworthy vessel "is a species of liability without fault, . . . and such liability does not depend either on negligence . . . or on notice[.]" *Oxley*, *supra*, 923 F.2d at 25 (quotations and citations omitted); *see generally Barlas v. United States*, 279 F. Supp.2d 201 (S.D.N.Y. 2003) (Chin, J.).  That is, if an unseaworthy condition is present which proximately causes a seaman's injury, then the exercise of due diligence or of reasonable care does not relieve the shipowner of its obligation. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960); *see also Barlow v. Liberty Maritime Corp.*, 746 F.3d 518, 528 (2d Cir. 2014)

22

("In admiralty, ship owners are strictly liable for injury resulting from the unseaworthiness of their vessel and the vessel's appurtenances.").

Thus, as with the Jones Act, assumption of risk is no defense to a seaworthiness claim. *Beadle v. Spencer*, 298 U.S. 124, 129 (1936) ("[A]assumption of risk is not a defense to a suit to recover for injury to a seaman resulting from unseaworthiness or defective equipment, . . . ."); *Rivera v. Farrell Lines, Inc.*, 474 F.2d 255, 256-57 & n.1 (2d Cir. 1973). The suitability of the barricades likewise may support a finding of unseaworthiness. *Scoran*, *supra*, 703 F. Supp.2d at 455-56. Captain Abdelrahman's issuance of an improvident order also constitutes unseaworthiness. *See Belle*, *supra*, 1998 WL, at *7 (steward's "giving an improvident order in an effort to rush the completion of the task."); *Combs*, *supra*, 73 F. Supp. at 666 (S.D.N.Y. 1947) ("inherently dangerous order under the circumstances"); *see also Marasa*, *supra* (failure to train); *Soliman*, *supra* (failure to train/restricted space).

**D.    The Court Erroneously Found Mezzina 100% at Fault, Conflating Any Comparative Fault (Possible) with Assumption of Risk (Prohibited).**

The court stated: "[T]he undisputed facts suggest that plaintiff failed to take even the slightest precaution in avoiding an open and obvious danger of which he was well aware." JSA.27. This unsupported pronouncement is merely a disguised

assumption of risk defense, prohibited under the Jones Act and general maritime law, and constitutes error.

Initially, there is no proof that Mezzina "failed to take even the slightest precaution . . . ." He did not intentionally fall or jump into the hatch. He was following orders from a superior officer, attempting to retrieve a line from the vessel's stern deck in the face of a previously damaged vessel banging against the pier.[5] He took the customary route to the stern deck under somewhat exigent circumstances—indeed the only direct and expedient route from the main deck, which required him to squeeze past the open hatch. New York Waterway's argument that he should have gone up the forward stairs to the top deck, across the top deck and down the aft stairs is belied by Mezzina's declaration, which the court should have considered. *See* § E, *infra*. At the very least, these issues may constitute comparative fault for resolution by a jury and present disputed issues of material fact.

---

[5] If a jury were to determine that Mezzina was following an order to retrieve the line via the main deck stern door, Mezzina's fault may be precluded from the jury's consideration. *See Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1323-24 (2d Cir. 1990) (affirming jury instruction that "[i]f you find that the plaintiff was injured because he was following the orders of his superiors, the captain, then you cannot find that there was any contributory negligence. That's true even if the plaintiff knew that the activity which he was ordered to do was dangerous."); *Darlington v. National Bulk Carriers Inc.,* 157 F.2d 817 (2d Cir.1946) (cited with approval in *Earl*, *supra*, 917 F.2d at 1324).

In *Scoran v. Overseas Shipholding Group*, 703 F. Supp.2d 437, 448 (S.D.N.Y 2010), the court distinguished the two doctrines:

> Plaintiff is correct that "assumption of risk" is not available as a defense to negligence under the Jones Act. Similarly, the defense may not be raised under the guise of comparative negligence. *See Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 58 (1943). There is, however, a sharp distinction between an "assumption of risk" defense and a "comparative negligence" defense. "Assumption of risk is 'the knowledgeable acceptance by an employee of a dangerous condition when and if such acceptance was necessary for the performance of his duties.'" *Ammar v. United States,* 342 F.3d 133, 139 (2d Cir. 2003) (*quoting Rivera v. Farrell Lines,* 474 F.2d 255, 257 (2d Cir.1973)). Where an "assumption of the risk" defense is available and successful, the injured plaintiff is entirely barred from recovery. *See Fonsell v. New York Dock Ry.,* 198 F. Supp. 332, 334 (E.D.N.Y.1961). On the other hand, "comparative negligence" is a doctrine under which recovery is reduced if the plaintiff is found to have been negligent and his own negligence contributed to his injury. *Ammar,* 342 F.3d at 139 (citing *Rivera,* 474 F.2d at 257). Comparative negligence does not act as a complete bar to recovery. *See id.* (cleaned up).

*See also Knight v. Grand Victoria Casino*, No. No. 98-8439, 2000 WL 1898843, at *1 (N. Dist. Ill. Dec. 28, 2000) ("To allow defendant to assert as a defense to liability that the risk was "open and obvious" would amount to allowing a defense of assumption of risk. Defendant may argue this as a factor in determining whether and the extent to which plaintiff was contributorily negligent, but it is not entitled to argue that it is a defense to liability. ").

### E. The Court Erred by Refusing to Consider Mezzina's Declaration.

Mezzina filed a declaration in opposition to New York Waterway's cross-motion for summary judgment. A.332-336. The district court refused to consider it,

relying on the "sham issue of fact doctrine" discussed in *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014). The court stated Mezzina's declaration was "in direct contradiction to his deposition testimony -- that when he fell into the open hatch 'there was no barricade set up and that he chose to walk in the narrow space between the open hatch and the passenger seats after having seen the captain do so'" JSA 7 n.9, *Mezzina*, 2024 WL, at *3 n.9. To the contrary, Mezzina testified that when he fell, the barricade was "not there no more." A.54,Tr.94. Thus, Mezzina's declaration did not "inescapably and unequivocally" contradict his earlier testimony. *Moll*, 760 F.3d at 206.

Moreover, Mezzina was never asked his precise route, other than he was moving towards the rear door. Accordingly, Mezzina's statement that he was intending to walk in the narrow space between the open hatch and the passenger seats does not contradict his deposition testimony, but merely supplements it. Because "there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998).

### F. The Court Erred by Failing To Issue Discovery Sanctions Due to New York Waterway's Spoliation of Photographs.[6]

The Captain photographed the damage, from inside the hatch (according to Mezzina) and from the adjacent work barge. The photos were emailed or texted to Alan Warren, NY Waterway's Vice President and Director of Operations, who admitted he "did receive via text or email photos that Capt. Abdelrahman took from the Weehawken work barge of M/V GARDEN STATE'S exterior," but inexplicably (indeed nonsensically) Warren "did not retain those photos as Port Captain Lombardi went to the work barge on the evening of October 1, 2021 to inspect the damage himself." A.321 ¶ 12.

The court declined to grant any relief, stating in part that "[i]ndisputably, a party cannot be required to produce that which does not exist" and that the Captain's photographs from the work barge would not have shown the barricades. SPA. 21-22; *Mezzina*, 2024 WL 689960, at *7. Obviously, the photographs existed, and they were relevant.

Spoliation exists when:

> (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed

---

[6] A cabin video camera would have undoubtedly captured the incident and proved most useful. *See* A.139, Fig. 10. Regrettably, the security camera "on that day was inoperable and had been for some time prior so no security footage from the cabin of the M/V GARDEN STATE existed." A.320, 321 ¶ 11.

27

with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139 (2d Cir. 2023).

> **1. New York Waterway Controlled the Photographs, They are Destroyed, and the Obligation to Preserve Them Arose When Mezzina was Injured.**

Control and destruction of the photographs is admitted by Warren.

The preservation obligation arose when Mezzina was injured, because NY Waterway was undeniably aware that an accident occurred involving its vessel and employee. *See, e.g., Quraishi v. Port Auth. of New York & New Jersey,* No. 13-cv-2706 (NRB), 2015 WL 3815011 (S.D.N.Y. June 18, 2015) (preservation obligation began when plaintiff was injured on defendant's premises); *Slovin v. Target Corp.*, No. 12-cv-863, 2013 WL 840865, at *3 (S.D.N.Y. March 7, 2013) (obligation to preserve began when plaintiff fell in defendant's store and was transported to a hospital by ambulance, and a representation letter sent a week later by plaintiff's counsel was "simply icing on the cake"); *Matteo v. Kohl's Dep't Stores, Inc.*, No. 09-cv-7830 (RJS), 2012 WL 760317 at *4 (S.D.N.Y. Mar. 6, 2012), *aff'd,* 533 F. App'x 1 (2d Cir. 2013) (preservation attached when plaintiff was injured in defendant's store because, given that defendants "were aware of [p]laintiff's injury . . . [d]efendants could have reasonably anticipated that [p]laintiff would bring a lawsuit").

### 2. New York Waterway Had the Requisite 'Culpable State of Mind' to Justify Spoliation Sanctions.

New York Waterway reported the allision and the Coast Guard investigated. The Coast Guard concluded that based on the Captain's investigation in the hatch (the "lazarette"), he "identified a hole in hull and damage to the deck plate at the starboard stern of the vessel near the transom." A.340. The severity of Mezzina's injury was known to New York Waterway virtually contemporaneously with the Captain's photography. On November 9, 2021, Mezzina's attorney sent a preservation letter, A.174-76, and demanded photographs in the litigation. A.184, 186 ¶ 10. Given the severity of the vessel damage and Mezzina's injury, coupled with Warren's nonsensical 'explanation' why the photographs were destroyed, New York Waterway's requisite 'culpable state of mind' seems overwhelming. As noted in *Rossbach*, "[t]he 'culpable state of mind' for a spoliation claim need not be intentional or willful, and may be found where the spoliation occurred due to negligence." *Rossbach*, *supra*, 81 F.4th at 140 (2d Cir. 2023) (citation omitted); *see also Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 108 (2d Cir. 2001) (spoliation sanctions warranted "even when no evidence indicating when the missing documents were destroyed or with what state of mind").

### 3. The Photographs are Relevant to Mezzina's Claim.

Even assuming the Captain photographed the vessel's exterior from the work barge only (and not inside the hatch), the work barge's close proximity to the vessel's

starboard side (where the hatch was situated), coupled with the numerous vessel windows, more likely than not would have shown whether the barriers were present. *See* work barge videos.

In the spoliation context, "[r]elevance is construed broadly, and the requested [evidence] must be more than a mere fishing expedition." *Grief v. Nassau Cnty.*, No. 15-7240, 2022 WL 307154, at *3 (E.D.N.Y. Feb. 2, 2022) (quotations omitted). That is, "[c]ourts must take care not to 'hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence,' because doing so would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) (quotation and citations omitted) (cleaned up).

## CONCLUSION

The order of the district court dismissing Mezzina's Jones Act and seaworthiness claims should be reversed and the case remanded.

Dated:  February 24, 2025        Respectfully submitted,

/s/ Andrew V. Buchsbaum
Andrew V. Buchsbaum
FRIEDMAN, JAMES & BUCHSBAUM LLP
15 Maiden Lane, Suite 1202
New York, NY   10038
(212) 233-9385
abuchsbaum@friedmanjames.com

30

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4)(A), which are authorized by Federal Rule of Appellate Procedure 32(e), because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 6730 words, as determined by the word-count function of Microsoft Word.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated:      February 24, 2025

                                             /s/ Andrew V. Buchsbaum
                                             Andrew V. Buchsbaum

# Special Appendix

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Memorandum and Order, dated February 20, 2024...   SPA-1

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
COSMO MEZZINA,

                    Plaintiff,

            - against –                        **MEMORANDUM AND ORDER**
                                               22 Civ. 1987 (NRB)
PORT IMPERIAL FERRY CORP. d/b/a
NY WATERWAY,

                    Defendant.

------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiff Cosmo Mezzina ("plaintiff" or "Mezzina") filed this
action on March 9, 2022 to recover damages for injuries he
sustained while employed as a deckhand for defendant Port Imperial
Ferry Corp. d/b/a New York Waterway ("defendant" or "NY Waterway").
See ECF No. 1 ("Compl."). Specifically, plaintiff seeks $5 million
in damages predicated on a negligence claim under the Jones Act,
46 U.S.C. § 30104 et seq., and an unseaworthiness claim under
general maritime law, and $500,000 in maintenance, cure, and
medical expenses. Compl. ¶¶ 9-20.

    Presently before the Court are the parties' cross-motions for
summary judgment on the issue of liability.[1] See ECF Nos. 27, 37.
For the reasons set forth below, plaintiff's motion for partial

---

[1] Neither party has brought a motion concerning plaintiff's claim for maintenance
and cure.

SPA-2

summary judgment is denied, and defendant's motion for partial summary judgment is granted.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.[2] They are drawn from plaintiff's Local Civil Rule 56.1 statement ("Pl. 56.1"), ECF No. 30; defendant's Local Civil Rule 56.1 counterstatement ("Def. Counter 56.1"), ECF No. 32; defendant's Local Civil Rule 56.1 statement ("Def. 56.1"), ECF No. 38; plaintiff's Local Civil Rule 56.1 counterstatement ("Pl. Counter 56.1"), ECF No. 47; and admissible materials submitted by the parties in connection with the present motions.

### I.    Factual Background

For nearly twenty years, from June 2002 until his accident on October 1, 2021, plaintiff was employed by NY Waterway as a deckhand.    ECF No. 29-1 ("Mezzina Dep.") 12:11-19, 40:6-18. Plaintiff's responsibilities included collecting tickets, checking the vessel's engine, and tying up the vessel at the dock.    Id. 40:19 – 41:5.    During this time, plaintiff served approximately

---

[2] Pursuant to Local Civil Rule 56.1, the Court treats as admitted the facts set forth in the Rule 56.1 statements unless "specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).  In addition, "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  Local Civil Rule 56.1(d).

-2-

ten to fifteen three-month stints on the "Garden State" -- the vessel on which his accident occurred.  Id. 45:2-25.

On October 1, 2021, the Garden State was servicing a route between Hoboken, New Jersey and Pier 11 in New York City.  Pl. Counter 56.1 ¶ 5.  On that day, the Garden State had a crew of three -- Captain Mohamed Abdelrahman, plaintiff, and a second deckhand, Roger McCullough.  Id. ¶¶ 5-7.  Plaintiff recalls that the water was "calm" at the start of his shift that day.  Mezzina Dep. 57:12-25.

About an hour after plaintiff's shift began, as the captain backed the vessel away from Pier 11 departing for Hoboken, the current and the waves pushed the vessel back into Pier 11 dock. Pl. Counter 56.1 ¶¶ 8-10.  Although the vessel appeared to have sustained minor damage, the captain decided to complete the trip to Hoboken as the passengers were unharmed.  Id. ¶¶ 11-13; ECF No. 29-2 ("Abdelrahman Dep.") 16:15-25, 17:16-23.  Once the passengers disembarked, the captain noticed additional damage to the vessel, and based on instructions from his manager, docked the Garden State at a work barge to undergo repairs.  Pl. Counter 56.1 ¶ 12.

Several minutes after tying the vessel to the work barge, the captain requested that plaintiff assist him with opening the hatch at issue in this litigation.  Id. ¶¶ 17, 18.  The hatch (pictures of which are available in Appendices A-C) was located on the floor

of the aisle leading to the ship's stern, just before the only door that opened to the afterdeck (i.e., the deck at the back of the ship), and in between rows of passenger seating and the engine room door.[3]  See Def. Counter 56.1 ¶¶ 16, 28; Mezzina Dep. 67:24 - 69:13; ECF No. 40-2.  The captain and plaintiff together removed the hatch cover by hand and placed the cover on the floor in between the hatch and the stern door so that the captain could access the vessel's lower deck, or the "lazarette," to assess the damage to the vessel.  Pl. Counter 56.1 ¶¶ 18, 19, 25, 26; Mezzina Dep. 75:16-25, 78:13 - 80:22.  Without the cover on, the hatch opening measured approximately 39 inches long by 32 inches wide. Def. Counter 56.1 ¶ 18.

Before descending the ladder leading to the lazarette, the captain asked plaintiff to retrieve barricades stored on the vessel.  Pl. Counter 56.1 ¶ 27; Mezzina Dep. 82:6-15; Abdelrahman Dep. 43:19 - 44:2.  The barricades consist of multiple units made of a synthetic material that can snap together.  Pl. Counter 56.1 ¶¶ 27-31; Def. Counter 56.1 ¶ 28.  Each measures approximately 39.5 inches high by 39.5 inches wide, is bright yellow, and contains reflective material.  Id.; Pl. Counter 56.1 ¶¶ 28.

---

[3] While exact measurements are not provided by the parties, plaintiff's expert and photographs of the vessel suggest that, when the hatch was open, there remained less than a foot of flooring between the open hatch and rows of passenger seating, and at most a few inches between the hatch and the engine door.  See, e.g., Pl. Mem. at 6; ECF No. 29-7 at 15.

-4-

SPA-5

According to plaintiff, the barricades are intended to serve as a visual warning for potential danger rather than as a physical barrier.[4]   Mezzina Dep. 125:9-21.   Plaintiff then set up the barricades[5] around at least two sides of the hatch: (1) the front side -- the direction from which plaintiff approached the hatch before his fall -- and (2) the starboard side running vertically along the aisle between the hatch and the rows of passenger seating.[6]   Pl. Counter 56.1 ¶¶ 30-32; see Appendix B.

Around this time, the captain entered the lazarette and plaintiff walked to the front of the vessel to speak with the other deckhand, McCullough, who sat in the first row of passenger seats due to an injury he had sustained in the collision that rendered him unable to continue working.   Pl. Counter 56.1 ¶¶ 16, 33; Def.

---

[4] As the discussion below will demonstrate, under the facts here, this is a distinction without a difference. As Figure 4 of plaintiff's moving memorandum establishes, ECF No. 28 at 7, it would have been necessary to move a barrier to navigate around the open hatch, i.e. the barriers were physical as well as visual. In addition, plaintiff offers no reason why a substantial, visual warning would have been insufficient under the circumstances.

[5] Plaintiff testified that he set up the barricades after the captain entered the lazarette, while the captain testified that he and plaintiff set up the barricades together before the captain descended. Mezzina Dep. 83:19-25; Abdelrahman Dep. 47:11-18. This fact is not material to the Court's analysis.

[6] The captain and plaintiff disagree as to the number of sides of the hatch the barricades surrounded. Specifically, plaintiff testified to setting up the barricades around two sides of the hatch, while the captain testified to barricading three sides of the hatch. Def. Counter 56.1 ¶¶ 28-30. However, this disagreement does not create a genuine issue of material fact, as it is undisputed that barricades blocked the side of the hatch from which plaintiff fell. Pl. Counter 56.1 ¶¶ 30, 31. Moreover, regardless of the number of barriers, plaintiff himself had opened the hatch minutes before his fall. See infra note 10.

SPA-6

Counter 56.1 ¶ 10; Mezzina Dep. 86:10 – 87:18; ECF No. 40-2;
Appendix D.   During this time, plaintiff testified to standing
approximately 10 to 12 feet from the open hatch, Mezzina Dep.
100:14 – 101:9, though plaintiff's counsel points out without any
specificity that the distance must have been greater given the
length of the vessel, Pl. Counter 56.1 ¶ 34.  Regardless, plaintiff
acknowledged that he could see the barricades from his position
and did not observe anyone move them.  Mezzina Dep. 100:14 – 101:4;
Pl. Counter 56.1 ¶ 36.   Similarly, the captain testified that he
did not move the barricades from their original position.
Abdelrahman Dep. 50:11-16; 55:11 – 56:9.

Mezzina recalled that the vessel started "rocking left and
right, . . . banging against the pier."  Mezzina Dep. 89:17-25.
The captain exited the lazarette and testified that he restored
the barricades to their original position surrounding the open
hatch.[7]  Abdelrahman Dep. 50:11-16; 55:11 – 56:9.  He then
instructed plaintiff to "get the [vessel's fourth] line," located
on the stern, to tie the unsecured starboard stern of the Garden
State to the work barge.[8]  Pl. Counter 56.1 ¶ 38; Mezzina Dep.

---

[7] Although plaintiff denies this fact in his Rule 56.1 Statement in opposition
to defendant's motion for summary judgment, Pl. Counter 56.1 ¶ 37, plaintiff
testified that he did not see anyone move the barricades and that he could still
see them after the captain exited the lazarette, Pl. Counter 56.1 ¶¶ 36, 42.

[8] Previously, when they docked the ship, the captain and plaintiff had secured
the vessel to the work barge with three lines.  Def. Counter 56.1 ¶ 14.

–6–

SPA-7

89:17-25; Abdelrahman Dep. 50:21 – 52:13. During this conversation, plaintiff was positioned even closer to the open hatch than when he was speaking to McCullough. Pl. Counter 56.1 ¶ 42. Plaintiff testified that throughout this exchange he could still see the barricades and did not see anyone move them. Id. The captain then exited the Garden State via the front of the vessel in order to catch the line from the work barge and further secure the ship. Pl. Counter 56.1 ¶ 41. At this point, plaintiff testified that he ran "a little bit" down the aisle toward the stern door "[b]ecause the boat was rocking" in order to retrieve and throw the line to the captain standing on the work barge. Mezzina Dep. 92:18-93:20, 95:2-6; Abdelrahman Dep. 51:18-52:13, 53:23-54:3. Plaintiff concedes that NY Waterway never instructed him to run when the boat was rocking. Mezzina Dep. 93:11-15.

While running, plaintiff fell into the open hatch.[9] Pl. Counter 56.1 ¶ 44. Although the exact timing is not clear, based

_____

[9] Plaintiff improperly attempts to amend his testimony and to create genuine issues of material fact through a declaration filed on June 23, 2023 in support of his opposition to defendant's motion for summary judgment. ECF No. 45. There, plaintiff states -- in direct contradiction to his deposition testimony -- that when he fell into the open hatch "there was no barricade set up" and that he chose to walk in the narrow space between the open hatch and the passenger seats after having seen the captain do so. Id. ¶¶ 18-19. However, "[f]actual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial." Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205 (2d Cir. 2014). Thus, this Court will not consider these contradictory statements made by plaintiff following the completion of discovery and the filing of defendant's motion for summary judgment.

-7-

on testimony and the video surveillance captured from a working
camera stationed on the work barge ("Work Barge Video"),[10]
plaintiff's fall occurred less than six minutes after he himself
opened the hatch with the captain.  Work Barge Video at 9:00-
14:42.  Although plaintiff testified that he did not see the
barricades immediately prior to his fall, he also stated that he
did not even look to see if they were still up before running
toward the stern door.[11]  Mezzina Dep. 94:5-25; 100:14 – 101:25.
No barricade fell into the lazarette with plaintiff.  Mezzina Dep.
94:19-22;; Abdelrahman Dep. 54:10 - 55:3.  Upon hearing screaming

---

[10] This video recording, provided to the Court on a USB drive by plaintiff along
with his motion for summary judgment, does not provide any insight into the
events that occurred inside the Garden State.  However, it does enable the
viewer to observe the crew's movements in and out of the vessel, and thus, in
conjunction with deposition testimony, it is possible to determine the
approximate time that passed between the removal of the hatch cover and
plaintiff's fall.  The timeline according to the video is as follows: the Garden
State pulls up to the work barge approximately two minutes and 20 seconds into
the video.  For the next 2 minutes and 45 seconds, from approximately 2:30
through 5:15, the video shows (and testimony confirms) Mezzina and the captain
tying the vessel to the work barge.  Mezzina Dep. 64:4-12; Abdelrahman Dep.
23:1 – 27:13.  The captain and plaintiff then enter the interior of the vessel,
out of view of the recording, and remain inside for under two minutes until
approximately 7:00, when the captain exits the vessel and walks along the work
barge to photograph the starboard side of the vessel.  Id. 27:14 – 28:19.  After
nearly two minutes, at approximately 8:55, the captain reenters the interior of
the vessel.  Testimony suggests that the captain and plaintiff removed the hatch
cover during this time.  Id. 32:21-24.  A little over five minutes later, at
14:06, the captain exits the vessel and walks along the vessel's starboard side
to catch the line from Mezzina, according to testimony.  Id. 52:14 – 54:3;
Mezzina Dep. 95:2-6.  At 14:40, 34 seconds later, the captain runs back toward
and into the vessel after he heard screaming from inside the vessel.  Abdelrahman
Dep. 54:4-6.  Accordingly, it is undisputed that the hatch cover was removed
sometime after the eight minute 55 second mark of the video and that plaintiff
fell into the hatch no later than the 14 minute 40 second mark -- less than six
minutes after the hatch was opened.

[11] There is no suggestion by either party that the third crew member, McCullough,
moved the barricades.

while he stood on the work barge, the captain ran back to the vessel.  Def. Counter 56.1 ¶ 40; Work Barge Video at 14:42-14:52. The captain testified that when he arrived to help plaintiff out of the lazarette, the barricades appeared to have been moved from surrounding at least two sides of the hatch to a different position, resting vertically along the aisle and perpendicular to the rows of passenger seating.[12]  Def. Counter 56.1 ¶ 44; Pl. Counter 56.1 ¶ 51; Abdelrahman Dep. 54:10 - 55:10, 55:25 – 56; see Appendix C.

## II.  Procedural Background

Following the completion of discovery, on March 16, 2023, the Court set a schedule for the parties to brief their cross motions for summary judgment.  ECF No. 26.  On May 5, 2023, Mezzina filed his motion for summary judgment, along with his memorandum of law, Rule 56.1 Statement, and supporting declarations and exhibits. ECF Nos. 27-31.  On June 6, 2023, defendant filed its opposition to plaintiff's summary judgment motion ("Def. Opp."), as well as its Rule 56.1 Statement in opposition to plaintiff's motion and supporting declarations and exhibits.  ECF Nos. 32-36.  Defendant also filed a cross-motion for summary judgment, accompanied by its

---

[12] Plaintiff testified that he did not see the guardrails again that day after his fall, as he was preoccupied with his injury and "was not looking at anything."  Mezzina Dep. 100:4-9; 106:10-20.

memorandum of law ("Def. Mem."), its Rule 56.1 Statement in support of its motion for summary judgment, and supporting declarations and exhibits. ECF Nos. 37-43. On June 23, 2023, plaintiff filed its Rule 56.1 Statement in opposition to defendant's motion for summary judgment, an opposition to defendant's summary judgment motion ("Pl. Opp."), and supporting declarations and exhibits. ECF Nos. 44-47. That same day, plaintiff filed his reply, ECF No. 48 ("Pl. Reply"), and on July 7, 2023, defendant filed its reply ("Def. Reply") and supporting declarations, ECF Nos. 49-53.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

"The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). "In moving for summary judgment against a party who

will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)); accord PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford, 391 F.3d at 83.

Once the moving party has satisfied its burden, to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue." Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990). There must be more than a "scintilla of evidence in support of the [non-movant's] position"; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. In other words, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material

-11-

facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987); see also Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991).

"The same standard of review applies when," as here, "the court is faced with cross-motions for summary judgment." Bell v. Pham, No. 09 Civ. 1699 (PAC), 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). "Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration." Id.

**DISCUSSION**

**I.   Plaintiff's Motion for Summary Judgment**

Plaintiff's motion for summary judgment raises three arguments, none of which require any examination of plaintiff's own role in his accident.  First, plaintiff relies on the "Protection of the Crew" regulation, 46 CFR § 42.15-75(d), in an effort to establish that the vessel was unseaworthy as a matter of law and that defendant is per se negligent for failing to provide "satisfactory means" to protect plaintiff from the open hatch, thus "precluding any proof of plaintiff's comparative fault."  ECF No. 28 ("Pl. Mem.") at 11-17.  Second, plaintiff argues that defendant's violation of the Protection of the Crew regulation triggers the application of The Pennsylvania Rule, thus shifting from plaintiff to defendant the burden of proving causation.  Id. at 17-20.  Third, plaintiff endeavors to rely on self-described discovery failures to preclude defendant from contesting liability.  Id. at 20-22.  For the reasons set forth below, plaintiff's efforts to prevail on legal doctrines and thus avoid a full examination of the facts fails.

**a. Negligence Per Se and Unseaworthiness as a Matter of Law**

**i.   Legal Standard**

Where a shipowner has violated a statutory or regulatory duty that results in the injury or death of an employee, the shipowner

may be liable without regard to negligence.  Kernan v. American Dredging Co., 355 U.S. 426, 431 (1958).  Moreover, The Pennsylvania Rule, "an oddity of admiralty law," shifts to defendants the burden of disproving causation where defendants have violated a maritime safety statute or regulation.  Wills v. Amerada Hess Corp., 379 F.3d 32, 42-43 (2d Cir. 2004) (citing The Pennsylvania, 86 U.S. 125, 136 (1873)).  However, a statutory or regulatory violation does not automatically trigger the application of The Pennsylvania Rule, which "is limited 'to the violation of a statute intended to prevent the catastrophe which actually transpired.'"  Reynolds v. Sealift, Inc., 311 F. App'x 422, 425 (2d Cir. 2009) (quoting Wills, 379 F.3d at 43).

### ii. Application

Plaintiff first asserts in his motion for summary judgment that defendant violated the United States Coast Guard Protection of the Crew regulation by failing to protect the open hatch in a "satisfactory" manner. Pl. Mem. at 11-17.  According to plaintiff, that regulatory violation has a direct nexus to plaintiff's injury; thus, the Court should find defendant liable on theories of negligence per se and unseaworthiness as a matter of law.  Id. at 15-17.  Further, plaintiff argues that, pursuant to The Pennsylvania Rule, the Court should shift to defendant the burden of disproving that the violation of the Protection of the Crew

regulation caused plaintiff's injury.  Id. at 17-20.  However, in his answering memorandum of law on defendant's motion for summary judgment, plaintiff essentially concedes this argument, stating that he "assumes that the Court will not apply" the requirements of the Protection of the Crew regulation to the Garden State.  Pl. Opp. at 1 n. 2.  While not a forthright concession, we understand it as such.  Regardless, while we are not privy to plaintiff's counsel precise thinking, there are two independent reasons that support a finding that the regulation does not apply to the Garden State, and thus we need not reach the question of whether defendant violated the regulation.

First, the requirements of the Protection of the Crew regulation do not apply to vessels "engaged exclusively in voyages on waters within the United States . . . and which are determined not to be 'coastwise' or 'Great Lakes voyages.'"  46 CFR § 42.03-5(b)(1)(v).  Plaintiff does not dispute that Garden State's certificate of inspection states that its "routes permitted" "are within the headings 'Lakes, Bays, and Sounds'" and "does not list the headings 'Coastwise' or 'Great Lakes,' which include routes of greater severity."  Pl. Counter 56.1 ¶¶ 56-58.  Specifically, the certificate of inspection "describes the [vessel's] permitted routes as 'lower New York Bay inside of a line drawn from Rockaway Point, New York to Sandy Hook, New Jersey; Long Island Sound inside

-15-

SPA-16

of a line drawn between Montauk Point Light to Southeast Light on Block Island.'" Id. ¶ 58. Despite this clear description, plaintiff points to, without any explanation or context, two screenshots of maps in order to argue that the Garden State's permitted routes "allow the vessel to travel in open ocean and thus do not fall within the exception of 46 CFR 42.03-5(b)(1)(v)." Pl. Reply at 5-6. Not only do these maps fail to support plaintiff's argument, as both images suggest that the vessel's routes are in fact limited to lakes, bays, or sounds, but plaintiff points to no evidence or caselaw that would permit this Court to disregard the vessel's certificate of inspection in determining the applicability of the Protection of the Crew regulation. Id. Moreover, as a matter of fact, the route of the vessel on the day of the accident was within its authorized route of lakes, bays, or sounds.

Second, the requirements of the Protection of the Crew regulation do not apply to "[m]erchant vessels of less than 150 gross tons." 46 CFR § 42.03-5(b)(1)(i). The Garden State's certificate of inspection states that the vessel weighs 95 gross tons under the Regulatory Measurement System and 205 gross tons under the Convention Measurement System. See ECF Nos. 29-3, 29-7 at 2. While the parties disagree as to which measurement system applies, Pl. Counter 56.1 ¶ 55, when vessels have been measured

-16-

under both the Convention Measurement System and the Regulatory Measurement System, as was the Garden State, 46 CFR § 69.20(c) provides for the application of "thresholds in effect before July 19, 1994 using the vessel's Regulatory Measurement System tonnage," 46 CFR § 69.20(c)(3). The tonnage threshold provided for Protection of the Crew regulation was in effect before July 19, 1994, see Protection of the Crew, 33 Fed. Reg. 135, 10062 (July 12, 1968); thus, because its tonnage under the Regulatory Measurement System is less than 150 gross tons, the Garden State is excluded from the requirements of the Protection of the Crew regulation.

For these reasons, plaintiff has failed to identify any regulatory violation that would serve as the basis for a negligence per se or an unseaworthiness as a matter of law claim, or the application of The Pennsylvania Rule. Therefore, his motion on this ground is denied.

### b. Preclusion from Contesting Liability Based on Alleged Discovery Violations

Plaintiff also seeks one of the most drastic sanctions permitted under Rule 37 of the Federal Rules of Civil Procedure for discovery abuses -- the preclusion of a defendant from contesting liability. Pl. Mem. at 20-22. Specifically, the title of Point III of plaintiff's moving memorandum of law states:

-17-

SPA-18

> DEFENDANT SHOULD BE PRECLUDED FROM CONTESTING LIABILITY
> BASED UPON ITS FAILURE TO PRODUCE THE COMPLETE ACCIDENT
> REPORT, PHOTOGRAPHS TAKEN BY CAPTAIN ABDELRAHMAN AND
> VIDEO OF THE ACCIDENT SCENE

Pl. Mem. at 20.

It is well-settled that a case-dispositive sanction such as the one sought is "generally disfavored" and only available in "extreme circumstances." See, e.g., Burns v. Bank of Am., No. 03 Civ. 1685 (JCF), 2007 WL 1589437, at *10 (S.D.N.Y. June 4, 2007); see also Conway v. Dunbar, 121 F.R.D. 211, 212-14 (S.D.N.Y. 1988) (in light of defendants' "continuing, deliberate withholding of important discovery material" "central to the proof of plaintiff's allegations," the court precluded defendants from offering evidence at trial on the issue of liability). Equally established in the caselaw is that such drastic or harsh sanctions should only be imposed when lesser sanctions have been considered. Grammar v. Sharinn & Lipshie, P.C., No. 14 Civ. 6774 (JCF), 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (courts "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future"); see also Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71 (2d Cir. 1988) (observing that "[t]he harshest sanctions available [under Rule 37] are preclusion of evidence and dismissal").

-18-

Here, plaintiff seeks the imposition of one of the most severe sanctions (1) without any prior applications to the Court or Court orders, see Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991), and (2) as the following discussion will demonstrate, having barely established even one disclosure failure. Each alleged discovery violation will be examined in turn.

First, plaintiff cites to defendant's delayed production of the reverse side of an otherwise single-sided accident report involving this incident, which contained three handwritten words: "Boat is secured." ECF No. 24-1 at 3. The delay in production is immaterial, as this fact is undisputed and consequently not in bad faith. In re Sept. 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (where a party produced evidence in an untimely manner, that party "should sustain liability for breaching its discovery obligations where such breach causes injury, but the moving party should not obtain a windfall for uncovering evidence that would have made little difference in the underlying case").

Second, plaintiff seeks sanctions because of the non-production of photographs taken by Captain Abdelrahman. The record on these photographs is clear. The captain testified to taking photographs of the damage to the vessel's exterior from the work

SPA-20

barge, but not of the interior from the lazarette. Abdelrahman Dep. 28:3 – 30:18; 32:21-24; Work Barge Video at 7:00-8:23. Moreover, the captain testified that any photographs he captured were taken prior to the removal of the hatch cover, and thus could not reveal the position of the barricades. Id.; Pl. Reply at 9. Further, given the captain's testimony, plaintiff's speculation about additional photographs is just that. Indisputably, a party cannot be required to produce that which does not exist. Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc., 318 F.R.D. 28, 42 (S.D.N.Y. 2016) ("Generally, a party's good faith averment that the items sought simply do not exist . . . should resolve the issue of failure of production since one 'cannot be required to produce the impossible.'"); Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 n. 7 (S.D.N.Y. 1992) ("the discovering party must make an adequate showing to overcome" a party's denial that it has possession of evidence).

Third, plaintiff seeks to preclude any defense on the merits for defendant's non-production of video footage that defendant maintains does not exist, as the relevant camera was not working on the day of the incident. Pl. Mem. at 20-22. Again, a party is not obligated to produce evidence that it asserts in good faith

does not exist.[13]  Here, plaintiff has failed to cite to any specific evidence challenging defendant's sworn statement that no responsive video surveillance exists.  See Margel v. E.G.L. Gem Lab Ltd., No. 04 Civ. 1514 (PAC) (HBP), 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008).

Having examined each predicate for plaintiff's motion to preclude, it is beyond cavil that none of them even remotely meets the standard for the relief sought.  Accordingly, plaintiff's baseless motion for preclusion is denied.

## II.  Defendant's Motion for Summary Judgment

The Court now turns to defendant's motion for summary judgment on plaintiff's first cause of action, which consists of his claims for Jones Act negligence and unseaworthiness.

### a. Negligence Claim Under the Jones Act

#### i. Legal Framework

Under the Jones Act, a "seaman injured in the course of employment . . . may elect to bring a civil action . . . against the employer," 46 U.S.C. § 30104, for injuries suffered "due to negligence of his employer," Lewis v. Lewis & Clark Marine, Inc.,

---

[13] Alan Warren, defendant's Vice President and Director of Operations, filed a declaration stating that video surveillance does not exist because the camera was inoperable around the time of plaintiff's accident.  ECF No. 35 ¶ 11. Plaintiff disputed this fact on the ground that the declaration failed to comply with the requirements of 28 U.S.C. § 1746.  Pl. Reply at 6-7.  However, on July 7, 2023, defendant filed a supplemental declaration that fully complied with 28 U.S.C. § 1746.  ECF No. 50.  Thus, the Court will consider Warren's declaration.

531 U.S. 438, 441 (2001). "Unlike the law of unseaworthiness, which focuses on the condition of the vessel, . . . the Jones Act places a separate and distinct duty on the owner to provide a reasonably safe workplace." Oxley v. City of New York, 923 F.2d 22, 25 (2d Cir. 1991) (citation omitted).

In order to establish negligence under the Jones Act, a plaintiff must show "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries." Diebold v. Moore McCormack Bulk Transp. Lines, Inc., 805 F.2d 55, 58 (2d Cir. 1986). "[I]n Jones Act cases, '[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed.'" Oxley, 923 F.2d at 25 (citations omitted). Thus, a plaintiff "shoulders a lighter burden for establishing negligence than her counterpart on land would carry." Wills v. Amerada Hess Corp., 379 F.3d 32, 45 (2d Cir. 2004) (cleaned up and citations omitted). However, "[i]t is well established that summary judgment is warranted where there is an absence of evidence that could 'justify with reason the conclusion that employer negligence played any part, even the slightest, in

-22-

producing the injury.'" <u>Id.</u> at 50 (emphasis in original) (quoting <u>Diebold</u>, 805 F.2d at 57-58).

As part of an employer's obligation to provide a reasonably safe place to work under the Jones Act, a shipowner has a duty to warn seamen of dangerous conditions of which the employer should be aware. Thomas J. Schoenbaum, Admiralty & Mar. Law § 6:21 (6th ed. 2023). However, there is no duty to warn crewmembers of "open and obvious" dangers, particularly those of which the crewmember is aware. <u>See, e.g.</u>, <u>Patterson v. Allseas USA, Inc.</u>, 137 F. App'x 633, 637 (5th Cir. 2005) (quoting <u>Farrell v. United States</u>, 167 F.2d 781, 783 (2d Cir. 1948)); <u>Vaughan v. All. Offshore, LLC</u>, No. Civ. 18-5571, 2019 WL 1778694, at *4 (E.D. La. Apr. 23, 2019) ("[T]here is no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known."); <u>Davila v. S/S Vercharmian</u>, 247 F. Supp. 617, 620 (E.D. Va. 1965), <u>aff'd</u>, 372 F.3d 93 (4th Cir. 1967) ("Assuming that the lighting conditions were sufficient . . . there is certainly no duty to warn anyone approaching an open hatch which would be apparent to anyone through the medium of 'looking downward.' . . . Certainly the law has not reached the point where warnings must be issued to seamen who are approaching . . . an open hatch which is in plain view").

### ii. Application

Plaintiff asserts without support that the captain's failure to re-cover the open hatch after leaving the lazarette constituted negligence under the Jones Act, despite the captain's order that plaintiff set up barriers measuring the same length as the open hatch on at least two sides of the hatch.[14]  Pl. Opp. at 6-9. Defendant does not contest the first two elements required to prove such a claim -- namely, that the open hatch on the Garden State presented a dangerous condition and that defendant had notice of the dangerous condition.  See Def. Mem. at 12-15.  However, defendant maintains that plaintiff has not adduced sufficient evidence to establish that any negligence on the part of defendant caused his injury, as the open hatch constituted an open and obvious danger of which plaintiff was well aware.  Id.

It is undisputed that less than six minutes before the accident, plaintiff and the captain together removed the hatch cover and set up bright yellow barricades, which were approximately the same length as the sides of the open hatch, around at least

_____

[14] Plaintiff also claims, again wholly without support, that the captain failed to re-cover the open hatch two separate times.  Pl. Opp. at 1, 6; see also Def. Counter 56.1 ¶ 32 (citing to no evidence in support of this assertion).  In fact, testimony directly contradicts this statement -- both plaintiff and the captain recall the captain entering the lazarette only once, after the captain had taken photographs of the exterior of the vessel and immediately following the removal of the hatch cover.  See Mezzina Dep. 89:3-25; Abdelrahman Dep. 32:13-24.

-24-

SPA-25

two sides of the hatch to warn the crew of potential danger.[15]  Pl. Counter 56.1 ¶¶ 25-28, 30-32; see Work Barge Video at 9:00-14:42. The captain subsequently entered the lazarette, and plaintiff walked to the front of the vessel, where McCullough, the incapacitated deckhand, was sitting and from where the barricades surrounding the open hatch remained in plaintiff's direct view. Pl. Counter 56.1 ¶ 36; Mezzina Dep. 100:14 – 101:9.  During this time, plaintiff testified that he did not observe anyone moving the barricades.  Id.  When the captain emerged from the lazarette and ordered Mezzina to throw the captain an additional line to further secure the vessel, plaintiff testified that he stood in the middle of the vessel -- even closer to the hatch -- and that he could see the barricades surrounding the open hatch.  Id. 101:10-25.

Shortly thereafter, plaintiff decided to run toward the stern door of the vessel, which was located directly behind the open hatch.[16]  Mezzina Dep. 92:18 – 93:24.  Although plaintiff does not

---

[15] The hatch opening was 39 inches long by 32 inches wide, and the barricades were 39.5 inches high and wide.  Pl. Counter 56.1 ¶ 28; Def. Counter 56.1 ¶ 18. As previously noted, whether the other two sides of the hatch were barricaded is immaterial, as it is undisputed that plaintiff approached the hatch from the front of the vessel before he fell, and neither party suggests that it was possible to either erect a barrier or pass the open hatch on the port side of the hatch between the hatch and the engine door.

[16] It is worth noting that both the captain and defendant's expert James Kline explained that "a safe alternate route remained available" to plaintiff by going "up one of the stairwells, aft the length of the vessel, then down the port

-25-

SPA-26

specifically recall seeing the barricades in place immediately preceding his fall,[17] plaintiff does not adduce any evidence that would create a genuine issue of material fact about whether the barricades remained around at least two sides of the hatch. Indeed, plaintiff's testimony was consistent that he did not observe anyone removing the barriers.  He has not controverted (1) his own testimony that he could see the barricades in place when he received the captain's order to retrieve an additional line to tie up the ship _after_ the captain had exited the lazarette, or (2) the captain's testimony that he put the barricade back in place after exiting the hatch.  Mezzina Dep. 93:25 – 94:25, 101:10-25; Pl. 56.1 ¶ 45; Abdelrahman Dep. 50:14-16, 55:16-24.  Beyond plaintiff's admission that there were barriers in place when he was directed to retrieve another line, there is no basis in the admissible record to support a conclusion that the barriers were not in place when plaintiff approached the hatch: the captain had left the area; plaintiff had not moved the barricades as of then; and the third crew member was disabled and sitting at the opposite end of the vessel.

---

side stairwell to the stern deck mooring station."  ECF Nos. 42 ¶ 8; 42-2 at 13; _see also_ Abdelrahman Dep. 51:5-17.

[17] Plaintiff testified that he did not check whether the barricades were still present before or while he ran toward the hatch.  Mezzina Dep. 94:5-13.

SPA-27

Considering the undisputed facts, plaintiff made a decision to pass the open hatch to retrieve an additional line, despite having removed the hatch cover less than six minutes earlier, having placed barriers to warn of the open and obvious danger, and having a totally safe alternative route to retrieve the additional line.[18]  Likewise, plaintiff cites no case law or other support suggesting that the captain acted negligently in failing to replace the hatch cover when he exited the hatch.  See generally Pl. Opp. at 6-9.  Indeed, even plaintiff's expert does not opine that that closing the hatch is required if "appropriate barricades" were put in place.  ECF 29-7 at 15.  In sum, plaintiff has failed to present any evidence establishing negligence on the part of either NY Waterway or the captain.  Wills, 379 F.3d at 50.  To the contrary, the undisputed facts suggest that plaintiff failed to take even the slightest precaution in avoiding an open and obvious danger of which he was well aware.  The undisputed facts are well within the caselaw, cited supra 23-24, finding no negligence on the part of shipowners in these circumstances.  Moreover, the facts favoring defendant are even stronger: here, before even removing the hatch cover, the captain ordered plaintiff to retrieve barriers to warn

_____

[18] Upon docking the vessel at the work barge, the captain and plaintiff had already secured the vessel with three of the four lines.  Pl. Counter 56.1 ¶ 38.  Plaintiff testified that he "generally [knew] what [he was] supposed to do" after arriving at the work barge and that no "other preparations . . . had to be made" after tying up three of the lines.  Mezzina Dep. 63:15 – 64:3.

-27-

the crew of the open hatch, and those barriers were installed and remained so prior to plaintiff approaching the hatch.  Given the undisputed facts, no reasonable jury could return a verdict for plaintiff on his Jones Act claim.

### b. Unseaworthiness

#### i. Legal Framework

Under the principle of unseaworthiness, a shipowner has "an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service."  Oxley, 923 F.2d at 24–25.  In contrast to a Jones Act claim, unseaworthiness "results in a species of liability without fault," and "does not depend on either negligence . . . or on notice."  Barlas v. United States, 279 F. Supp. 2d 201, 206 (S.D.N.Y. 2003) (internal citations and quotation marks omitted); see also Barlow v. Liberty Mar. Corp., 746 F.3d 518, 528 (2d Cir. 2014) ("In admiralty, ship owners are strictly liable for injury resulting from the unseaworthiness of their vessel and the vessel's appurtenances.").

However, while the duty to furnish a seaworthy ship "is absolute," "[t]he standard is not perfection, but reasonable fitness."  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960); see also Martinez v. City of New York, 684 F. App'x 90, 92 (2d Cir. 2017) ("Seaworthiness does not demand an accident-free ship, only one reasonably fit to be at sea" (citing Lewis, 531

-28-

U.S. at 441)).  In order to establish unseaworthiness, a plaintiff must show that the vessel is "insufficiently or defectively equipped" and "that his injuries resulted from the unseaworthy condition of the vessel." Oxley, 923 F.2d at 26; Golden v. City of New York, No. 14 Civ. 2229 (LAK), 2015 WL 4510439, at *1 (S.D.N.Y. July 24, 2015) ("[T]he burden is on the plaintiff to offer at least some competent proof" of an unseaworthy condition and defendant does not have the burden "to prove the negative."); Barlow v. Liberty Mar. Corp., No. 08 Civ. 4436 (VVP), 2012 WL 12857416, at *7 (E.D.N.Y. Dec. 26, 2012), aff'd, 746 F.3d 518 (2d Cir. 2014) (Plaintiff must show "by a preponderance of the evidence that the ship, its equipment or crew, was unseaworthy").  Whether a ship is seaworthy "is relative and varies with the vessel involved and the use for which the vessel is intended."  Atl. Specialty Ins. Co. v. Coastal Envtl. Grp. Inc., 945 F.3d 53, 68 (2d Cir. 2019) (citations and internal quotation marks omitted).

District courts in the Second Circuit have disagreed as to "what level of causation is required for unseaworthiness claims." Juliussen v. Buchanan Marine, L.P., No. 08 Civ. 1463 (DCP), 2010 WL 86936, at *11 n. 26 (S.D.N.Y. Jan. 7, 2010) (collecting cases). While the court in Milos v. Sea-Land Serv., Inc., 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979), held that an unseaworthiness claim requires the same light showing of causation as a Jones Act claim,

-29-

most courts require that "1) the unseaworthiness played a substantial part in bringing about or actually causing the injury; and 2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  Saleh v. United States, 849 F. Supp. 886, 895 (S.D.N.Y. 1994); see also Juliussen, 2010 WL 86936, at *11 n.26 (applying the Saleh standard); Lisowski v. Reinauer Transp. Co., No. 03 Civ. 5396 (NGG), 2009 WL 763602, at *13–14 (E.D.N.Y. Mar. 23, 2009) (same); Sadler v. Moran Towing Corp., 204 F. Supp. 2d 695, 697 (S.D.N.Y. 2002) (same).  Under the Saleh standard for causation, "the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy."  Golden v. City of New York, No. 14 Civ. 229 (AJP), 2015 WL 2237540, at *6 (S.D.N.Y. May 14, 2015) (internal quotations marks and citations omitted).

### ii. Application

Plaintiff's articulation of a claim of "unseaworthiness" is limited to two point headings: "THE CAPTAIN'S FAILURE TO RE-COVER THE HATCH AFTER HE LEFT IT TWICE CONSTITUTES NEGLIGENCE UNDER THE JONES ACT & RENDERS THE VESSEL UNSEAWORTHY," Pl. Opp. at 6, and "For similar reasons, the open hatch with no one in it constituted an unseaworthy condition," id. at 10.  Essentially, plaintiff is reiterating his Jones Act claim, which for the reasons already

articulated is untenable.  In addition, plaintiff's articulation
of his "unseaworthiness" claim is disingenuous: there was not
simply an open hatch.  Rather, there were barriers on at least two
sides of the hatch, including the side from which plaintiff
approached the hatch before he fell.  Although plaintiff and the
captain dispute whether a third side was barricaded, that side
played no role in the incident, and there was no need for a barrier
on the fourth side because the space between the hatch and the
engine door was too narrow for even an attempted passage.  See
supra pp. 4-5.

Plaintiff also seems to claim that the Garden State was
unseaworthy despite the presence of bright yellow 39.5 inch by
39.5 inch barriers around the hatch.  Pl. Opp. at 11-12.  To the
contrary, defendant maintains "[t]he undisputed facts show that
the hatch was barricaded with a bright yellow, three-foot-plus
high barricade which served as a visual barrier when [p]laintiff
approached it and therefore that [p]laintiff had notice of the
open hatch. Under the circumstances, on a docked, passenger-free
vessel, [p]laintiff cannot prove negligence or unseaworthiness
when he had notice of an open, but barricaded hatch, which is an
open and obvious danger."  Def. Mem. at 14.

While it is true that unseaworthiness is typically a question
for the jury, see, e.g., Oxley, 923 F.2d at 26, summary judgment

is appropriate here, as plaintiff has not presented any evidence that would lead a reasonable jury to conclude that the Garden State was insufficiently or defectively equipped when a hatch temporarily opened for inspection of the vessel was guarded by barriers adequate to serve as a protective warning, particularly when plaintiff had himself removed the hatch cover minutes earlier. More specifically, plaintiff fails to point to any facts, customs, practices, or caselaw that suggest that either the failure to re-cover or to provide a permanent physical barrier to guard a briefly uncovered hatch renders a ship unseaworthy. In fact, analogous cases suggest the opposite, particularly when the open hatch was adequately lit, when plaintiff had notice of the opening, and when a safe alternative route was available -- all of which were the case here. See, e.g., Valentine v. St. Louis Ship Bldg. Co., 620 F. Supp. 1480, 1483 (E.D. Mo. 1985), aff'd 802 F.2d 464 (8th Cir. 1986) (declining to hold a ship unseaworthy for failing to install railings around a temporarily open hatch situated in an adequately lit location where it was neither customary nor feasible to do so, particularly when the plaintiff knew that the hatch had been opened); Davila, 247 F. Supp. at 617-18 (dismissing unseaworthiness claim, among others, where the plaintiff neglected "to exercise even the slightest degree of care for his own safety" by failing to turn on lights that would have adequately lit an

SPA-33

open hatch "apparent to anyone . . . 'looking downward,'" particularly as the plaintiff was "thoroughly familiar with the area involved" and an alternate route was available); see also Testa v. Moore-McCormack Lines, Inc., 229 F. Supp. 154, 158 (S.D.N.Y. 1964) (declining to find vessel unseaworthy where plaintiff's fall was not proximately caused by the presence of grease, but rather by his own negligence that did not "meet the standard of care of the ordinary prudent man," especially in consideration of safe alternative routes, among other things).

Plaintiff also argues in his opposition that the barricades stored on the Garden State "were unsuitable and unsatisfactory protection for the open hatch on a rocking vessel," and suggests that defendant should have erected a physical barrier comparable to the vessel's exterior safety rails. Pl. Opp. at 11-12. To the extent that this argument relates to his claim of unseaworthiness, plaintiff again fails to point to any persuasive facts or caselaw supporting the proposition that a temporarily open hatch constitutes unseaworthiness unless it is surrounded by a non-movable physical barrier. Id. Instead, plaintiff attempts to argue that defendant's expert James Kline "equat[ed] the barricade to the 'safety rail on the exterior of the vessel,'" implying that the vessel failed to comply with the safety rail requirements of 46 CFR § 116.900. Id. at 12. However, this completely misstates

-33-

Kline's testimony, which simply compared the height of the Melba Swintex barricades to the height of vessel's exterior safety rails. ECF 42-2 at 13 (concluding that "[i]t appears that this barricade's design and construction is meant to be a visual barrier and not a physical one. It's [sic] height (39.5-inches) is equivalent to the safety rail on the exterior of the vessel.").

Moreover, even plaintiff's own expert, Captain Joseph Ahlstrom, did not go so far as to suggest that defendant was obligated to guard the temporarily opened hatch with the equivalent of exterior deck rails.   ECF No. 29-7 at 15.   Instead, Captain Ahlstrom concluded that "[u]pon leaving the hatch, Captain Abdelrahman should have either (a) replaced the hatch cover; or (b) ensured that appropriate barricades were in place, especially given the rough sea conditions which caused the vessel to rock." Id.   In no way does this support plaintiff's contention that the use of moveable barricades on a docked vessel constitutes unseaworthiness, as there has been no suggestion by plaintiff or otherwise that the barricades were displaced by natural forces.[19] Plaintiff's argument that defendant was required to create a non-moveable physical barrier in the context of a temporary reason for

---

[19] Moreover, because the undisputed facts indicate that the captain returned the barricades to their original position surrounding the hatch after exiting the lazarette, as discussed above, the captain satisfied the requirements outlined by plaintiff's expert.

SPA-35

the hatch to be open for a matter of minutes, especially when the captain directed the installation of substantial barricades measuring 39.5 inches high and 39.5 inches wide around the opening that plaintiff had created and barricaded less than six minutes before, is wholly untenable.

Because plaintiff has failed to offer any proof of a defective condition on the Garden State or that the vessel or its appurtenances were not fit for their intended purpose, Golden, 2015 WL 4510439, at *1, this Court grants defendant's motion for summary judgment on plaintiff's unseaworthiness claim.

SPA-36

**CONCLUSION**

For the reasons set forth above, defendant's motion for partial summary judgment is granted as to plaintiff's claims under the Jones Act and general maritime law. Plaintiff's motion for partial summary judgment as to claims of negligence <u>per se</u> and unseaworthiness as a matter of law is denied. Further, plaintiff's motion to sanction defendant for alleged discovery disputes by precluding defendant from contesting liability is also denied. The Clerk of Court is respectfully directed to close the motions pending at ECF Nos. 27 and 37.

**SO ORDERED.**

Dated:    New York, New York
          February 20, 2024

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

-36-

SPA-37

**APPENDICES**

**A. Appendix A**



**B. Appendix B**



SPA-39

**C. Appendix C**



D. Appendix D

